UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK

_____

DOUGLAS DIXIE,

                                        Plaintiff,

                        v.                                                5:05-CV-345
                                                                          (C.J. Mordue)
COMMISSIONER OF SOCIAL
SECURITY,

                                        Defendant.

_____

APPEARANCES:                            OF COUNSEL:

McMAHON, KUBLICK LAW FIRM               JENNIFER GALE SMITH, ESQ.
Attorneys for Plaintiff

GLENN T. SUDDABY                        WILLIAM H. PEASE
United States Attorney for the          Assistant U.S. Attorney
Northern District of New York
Attorney for Defendant

GUSTAVE J. DI BIANCO, Magistrate Judge

## REPORT-RECOMMENDATION

This matter was referred to me for report and recommendation by the Honorable

Norman A. Mordue, Chief United States District Judge,  pursuant to 28 U.S.C. §

636(b) and Local Rule 72.3(d).  This case has proceeded in accordance with General

Order 18.

## PROCEDURAL HISTORY

Plaintiff filed an application for disability insurance benefits which was denied

on March 12, 2003. Administrative Transcript (T) at 56-58, 26-30.  Plaintiff requested

a hearing before an Administrative Law Judge ("ALJ") which was held on May 4,

2004. (T. 253-88).  On January 19, 2005, the ALJ issued a decision, denying

plaintiff's application. (T. 17-25).  The ALJ's decision became the final decision of

the Commissioner  when the Appeals Council denied plaintiff's request for review on

February 3, 2005. (T. 4-6).

## CONTENTIONS

The plaintiff makes the following claims:

1.    The ALJ failed to give proper weight to the residual functional capacity
      assessment by plaintiff's treating physician. (Plaintiff's Brief at 7-10, 12-
      13)(Points I and III)(Dkt. No. 9).

2.    The ALJ failed to properly analyze the vocational expert's testimony.
      (Plaintiff's Brief at 11)(Point II).

3.    The ALJ did not properly consider plaintiff's complaints of pain.
      (Plaintiff's Brief at 14-15)(Point IV).

4.    Plaintiff meets the requirement of 20 C.F.R. Pt. 404, Subpt. P, App. 2
      § 201.00(h)(1).[1] (Plaintiff's Brief at 16-17)(Point V).

5.    The job identified by the Vocational Expert (VE) at plaintiff's hearing
      does not exist in "significant numbers." (Plaintiff's Brief at 18)(Point VI).

---

[1] Plaintiff's counsel does not cite this section properly.  The brief stated that plaintiff meets the
requirements of "Vocational Guideline 201(h)(i)." (Plaintiff's Brief at 16).  On the next page, counsel
refers to this section as "Listing 201 (h)(i)."  As the defendant points out, there is no such section, but
the language cited by plaintiff's counsel appears in section 201.00(h)(1).  This section is an
explanatory section that appears as an introduction to the Medical Vocational Guidelines (the Grid)
for individuals who are restricted to sedentary work.  Additionally a "Listed Impairment" refers to an
impairment listed in Appendix 1 of 20 C.F.R. Part 404, Subpart P.  If a claimant has a "Listed
Impairment," he or she meets the standard for disability without consideration of vocational factors.
There is no indication in this case that plaintiff meets the requirements of a "Listed Impairment."

2

6.      This case should be remanded for calculation of benefits. (Plaintiff's Brief at 19)(Point VII).[2]

Defendant has filed a brief in support of the Commissioner's decision and requests dismissal of the complaint. (Dkt. No. 14).

On May 3, 2006, plaintiff filed a letter-motion requesting that the case be remanded to the Commissioner for the consideration of "new and material evidence." (Dkt. No. 15).  Defendant Commissioner has responded in opposition to the motion. (Dkt. No. 16).

## DISCUSSION

## 1.      **Disability Standard**

To be considered disabled, a plaintiff seeking disability insurance benefits or SSI disability benefits must establish that he is "unable to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months ...." 42 U.S.C. § 1382c(a)(3)(A).  In addition, the plaintiff's

> physical or mental impairment or impairments [must be] of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work.

---

[2] Plaintiff's counsel's Table of Contents switches the last two point headings, but this court has cited the point headings as they appear in the body of the brief, together with their corresponding page numbers.

42 U.S.C. § 1382c(a)(3)(B).

The Commissioner uses a five-step process, set forth in 20 C.F.R. §§ 404.1520 and 416.920 to evaluate disability insurance and SSI disability claims.

> First, the [Commissioner] considers whether the claimant is currently engaged in substantial gainful activity.  If he is not, the [Commissioner] next considers whether the claimant has a "severe impairment" which significantly limits his physical or mental ability to basic work activities. If the claimant suffers such an impairment, the third inquiry is whether, based solely on medical evidence, the claimant has an impairment which meets or equals the criteria of an impairment listed in Appendix 1 of the regulations.  If the claimant has such an impairment, the [Commissioner] will consider him disabled without considering vocational factors such as age, education, and work experience; ... .  Assuming the claimant does not have listed impairment, the fourth inquiry is whether, despite the claimant's severe impairment, he has the residual functional capacity to perform his past work.  Finally, if the claimant is unable to perform his past work, the [Commissioner] then determines whether there is other work which the claimant can perform.

*Berry v. Schweiker*, 675 F.2d 464, 467 (2d Cir. 1982); *see* 20 C.F.R. §§ 404.1520, 416.920.

The plaintiff has the burden of establishing disability at the first four steps. However, if the plaintiff establishes that his impairment prevents him from performing his past work, the burden then shifts to the Commissioner to prove the final step. *Bluvband v. Heckler*, 730 F.2d 886, 891 (2d Cir. 1984).

## 2.    Scope of Review

In reviewing a final decision of the Commissioner, a court must determine whether the correct legal standards were applied and whether substantial evidence supports the decision. *Rosado v. Sullivan*, 805 F. Supp. 147, 153 (S.D.N.Y. 1992)

4

(citing *Johnson v. Bowen*, 817 F.2d 983, 985 (2d Cir. 1987)).  A reviewing court may not affirm an ALJ's decision if it reasonably doubts whether the proper legal standards were applied, even if the decision appears to be supported by substantial evidence. *Johnson*, 817 F.2d at 986.  In addition, an ALJ must set forth the crucial factors justifying his findings with sufficient specificity to allow a court to determine whether substantial evidence supports the decision. *Ferraris v. Heckler*, 728 F.2d 582, 587 (2d Cir. 1984).

A court's factual review of the Commissioner's final decision is limited to the determination of whether there is substantial evidence in the record to support the decision. 42 U.S.C. § 405(g); *Rivera v. Sullivan*, 923 F.2d 964, 967 (2d Cir. 1991). "Substantial evidence has been defined as 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Williams on behalf of Williams v. Bowen*, 859 F.2d 255, 258 (2d Cir. 1988)(citations omitted).  It must be "more than a scintilla" of evidence scattered throughout the administrative record. *Richardson v. Perales*, 402 U.S. 389, 401 (1971)(quoting *Consolidated Edison Co. v. NLRB*, 197 U.S. 229 (1938)).

"To determine on appeal whether an ALJ's findings are supported by substantial evidence, a reviewing court considers the whole record, examining the evidence from both sides, because an analysis of the substantiality of the evidence must also include that which detracts from its weight." *Williams*, 859 F.2d at 258. However, a reviewing court cannot substitute its interpretation of the administrative record for that of the Commissioner if the record contains substantial support for the

ALJ's decision. *Blalock v. Richardson*, 483 F.2d 773, 775 (4th Cir. 1972). *See also Rutherford v. Schweiker*, 685 F.2d 60, 62 (2d Cir. 1982), *cert. denied*, 459 U.S. 1212 (1983).

**3.**   **Facts**

   **A.  Non-Medical Evidence**

Plaintiff was born on May 27, 1956 and was 47 years old at the time of the administrative hearing in this case. (T. 56).  Prior to November of 2002, plaintiff worked in a frozen food warehouse, preparing food orders for shipment. (T. 255). Plaintiff testified that he would go into the freezer, place the cases of food on a pallet pursuant to the customer's order, and bring the food to the trucks for shipping. (T. 255).  On November 16, 2002, plaintiff had a serious car accident in which his left hand was crushed. (T. 120).  The accident resulted in the partial amputation of plaintiff's thumb. (T. 112).  Plaintiff had two surgeries on his hand at the time of the accident, and a subsequent surgery on April 27, 2004. (T. 112, 194-95).

The record contains a form entitled "Disability Report-Adult," signed by plaintiff on January 30, 2003. (T. 64-73).  In this report, plaintiff stated that he completed the 12th grade, and that he did ***not*** attend special education classes. (T. 71). Plaintiff also stated that he could read English and write "more than [his] name in English." (T. 64).  The form asked plaintiff to state what were the "illnesses, injuries, or conditions" that limited his ability to work. (T. 65).  Plaintiff's answer to this question stated ***only*** that the limitation on his ability to work was due to the injury to his left hand and wrist, together with the resulting loss of the use of the left hand. (T.

6

65).  The ALJ found, however, that based on the medical records, plaintiff did have additional severe impairments of a left shoulder disorder and residuals of left knee trauma. (T. 21).  Although plaintiff also claims that he has non-insulin dependent diabetes, the ALJ found that plaintiff's diabetes was adequately managed and not "severe." (T. 22).

During the hearing, plaintiff was asked about the reading ability required at his former job. (T. 255-63).  Plaintiff stated that as a warehouse worker, he did not have to keep any records himself, but he was given "paperwork" to go through when determining how to fill the pallet. (T. 255).  Plaintiff stated that he would have to go into the warehouse and get a certain number of cases, then he would put a "check mark" on the form to indicate that he had completed the task. (T. 255).  Plaintiff stated that he did not have to "figure out" any more than that, but did state that he participated in a yearly inventory. (T. 255).  Plaintiff testified that in order to complete the inventory, he would be given a "check list," he would go to a specific location with another employee, and they would check to see how many cases were on the pallet. (T. 256).

Plaintiff stated that although he had a high school diploma, he read "very little," and he had a "learning disability." (T. 263).  Plaintiff told the ALJ that plaintiff's mother had read plaintiff the notice of the hearing, and that plaintiff could only read a little bit of the "sport's page." (T. 263).  Plaintiff stated that he took an oral test for his driver's license, but that he could read street signs. (T. 261).  Plaintiff also testified that he did not "read that much," and he could not write even a note or a letter. (T.

7

263).  Finally, plaintiff stated that although he could not write, he could add and

subtract and became "pretty good" with numbers. (T. 264).

## B.  Medical Evidence of Record

Plaintiff's treating physician for his hand and wrist impairments is Dr. Jon

Loftus, an orthopedic surgeon.  Dr. Loftus performed the surgeries on plaintiff's left

hand, beginning with the two surgeries that plaintiff underwent following his

November 16, 2002 car accident. (T. 112-31).  Dr. Loftus's discharge summary stated

that plaintiff was admitted with multiple fractures of the left hand and a near complete

amputation of the left thumb. (T. 112).  The first surgery was performed on November

16, 2002. (T. 115-17).  During the first surgery, Dr. Loftus "pinned" the fractures, re-

aligning the broken bones in plaintiff's hand. (T. 112, 115-17).  Dr. Loftus performed

the second surgery on November 18, 2002. (T. 113-14).  During the second surgery,

Dr. Loftus amputated the tip of plaintiff's left thumb. (T. 113-14).

The record contains many subsequent reports by Dr. Loftus. (T. 136-47, 162-68,

194-96,[3] 205-206).  After the first surgery, periodic x-rays were taken to check the

status of the healing process. (T. 142-47, 167-68).  On November 21, 2002, Dr. Loftus

stated that plaintiff's wounds were healing nicely, and the x-rays showed very

satisfactory alignment. (T. 141).  The November 21, 2002 report also stated that

plaintiff was beginning to feel pain in his wrist, and Dr. Loftus stated that the pain

might have been due to a fracture that he had not seen. (T. 141).

---

[3] The court notes that there are three copies of the records of plaintiff's April 27, 2004 surgery. (T. 194-96, 224-26, 241-43).  There is an additional copy of page 196 at page 207.  Pages 196, 226, 243 and 207 are all copies of a pre-operative note, dated April 22, 2004.

On December 12, 2002, Dr. Loftus referred plaintiff to physical therapy. (T. 140). On January 13, 2003, Dr. Loftus stated that the alignment of plaintiff's fracture was "actually quite impressive." (T. 138). However, plaintiff was still complaining of wrist pain. (T. 138). Dr. Loftus stated that plaintiff's range of motion was "absolutely terrible," but that this was "not surprising." *Id.* Dr. Loftus stated that plaintiff would continue with therapy. *Id.* On February 2, 2003, Dr. Loftus stated that the x-rays still showed "nice" alignment relative to plaintiff's injury which was "quite severe." (T. 137). The x-rays also showed evidence of healing fractures. (T. 137). Plaintiff's finger motion was better, but this was compared to "non-existent" the last time. (T. 137).

On June 6, 2003, Dr. Loftus stated that plaintiff continued to make progress, and that his wrist range of motion was "very good and functional," and although it was not completely painless, the range of motion was better than the doctor thought it was going to be. (T. 166). Dr. Loftus stated that the range of motion would probably be good enough for "day-to-day activities." (T. 166). Dr. Loftus stated that he believed plaintiff's chances of "meaningful high demand work" with his upper extremities were "poor." (T. 166).

On July 30, 2003, Dr. Loftus stated that plaintiff was "doing fabulously in therapy," that his wrist did not hurt at all, and that plaintiff had good flexion and extension. (T. 166). Although the doctor thought that plaintiff would never be able to bring his index finger and long fingers down all the way to his palm, he was "certainly getting them out of the way when he [went] to make a fist." (T. 166). On September

9

25, 2003, Dr. Loftus stated that although plaintiff was continuing to make strides, the doctor did not think that plaintiff was ever going to return to his **previous** work because of the degree of lifting and the low temperature in the warehouse. (T. 164). On November 20, 2003, Dr. Loftus stated that plaintiff's wrist was "functional and painless," and that he would continue to improve in therapy even if his fingers would never be normal. (T. 163).

On January 22, 2004, Dr. Loftus reported that plaintiff had reached a plateau in therapy. (T. 162). Dr. Loftus stated that because of the limitation in the motion of plaintiff's fingers and the shortness of the thumb, plaintiff could not really "oppose [his fingers and thumb]." *Id.* Dr. Loftus suggested an operation involving "capsulotomies" of the PIP joints of the long fingers. *Id.* This recommendation resulted in plaintiff's surgery of April 27, 2004. The purpose of the surgery on April 27, 2004 was to improve the range of motion in plaintiff's fingers by opening up the joint capsules and also by freeing the tendons in plaintiff's hand that might have adhered to other tissue. (T. 194). Dr. Loftus's operative note from the April 27, 2004 surgery stated that plaintiff's range of motion "dramatically improved compared to preoperatively." (T. 195).

On April 29, 2004, Dr. Loftus noted that plaintiff began a post-surgery therapy program, and on May 7, 2004, Dr. Loftus stated that plaintiff was "doing great." (T. 205, 206). Dr. Loftus noted that plaintiff was making "significant strides" in physical therapy, and the doctor recommended that plaintiff continue "aggressive therapy." (T. 206).

The record also contains the physical therapy notes that are contemporaneous to Dr. Loftus's reports. (T. 133-35).  Plaintiff's initial consultation with the physical therapist was on November 21, 2002. (T. 135).  Between December 17, 2002 and February 5, 2003, plaintiff had sixteen physical therapy sessions. (T. 133-35).  Plaintiff was treated with moist heat and range of motion exercises. *Id.*  On January 28, 2003, plaintiff had a slight increase in the range of motion at his fifth finger. (T. 134).

On January 29, 2003, plaintiff reported numbness in his forearm, thumb, and index finger. (T. 133).  On January 29, plaintiff also complained of shoulder pain and limitation of movement with internal rotation of his shoulder. (T. 134-33)[4].  Shay Klein, the physical therapist stated that an "impingement" test of the shoulder was positive. (T. 133).  There was pain and discomfort on palpation of the anterior aspect of the shoulder.[5]  External rotation of the shoulder combined with abduction was also painful. *Id.*  The therapist noted that plaintiff was going to discuss his shoulder problem with Dr. Loftus on "Monday." *Id.*

---

[4] The court notes that the physical therapy notes for January 29, 2003 begin on page 134, but continue on to page 133.

[5] Although there is no indication which of plaintiff's shoulders was painful, the court assumes that it was his left shoulder because the therapist was working with plaintiff's left hand and did not distinguish the sides when he began to discuss the shoulder. (T. 133).

The record contains additional physical therapy notes. (T. 169-80).[6]  Between February 7, 2004 and January 24, 2004, plaintiff attended sixty one physical therapy sessions. (T. 171-80).  Plaintiff's physical therapy focused on his hand and wrist impairment.  The treatments included moist heat, wrapping plaintiff's fingers into flexion, and squeezing exercises. *Id.*  On July 30, 2003, Physical Therapist Klein noted that Dr. Loftus was pleased with plaintiff's progress, including his wrist movement and forearm movement. (T. 177).  The physical therapist also stated that Dr. Loftus noted improvement in the range of motion of plaintiff's fingers into flexion. *Id.*  Although the reports indicate some improvement, by December 30, 2003, the physical therapist stated that plaintiff was reporting "no change," and by January 22, 2004, the therapist noted that Dr. Loftus was planning on performing an operation to "release" plaintiff's tendons and his joints. (T. 180).

Because of the pain in plaintiff's left shoulder, he was examined by Dr. John P. Cannizzaro, an orthopedic surgeon, working with Dr. Loftus at Upstate Medical Center in Syracuse, New York.[7] (T. 152-56).  The record contains three reports by Dr. Cannizzaro. (T. 154-56).  Dr. Cannizzaro's March 27, 2003 report states that plaintiff injured his left shoulder in an motor vehicle accident on "1/16/03." (T. 154).  The

---

[6] The court notes that the record of physical therapy notes is a little confusing.  Pages 169 through part of page 171 appear to be duplicates of the notes on pages 133-35.  Page 133 ends with a notation dated February 5, 2003.  The same note of February 5, 2003 appears almost at the bottom of page 171.  The notes then continue chronologically after February 5, 2003.

[7] The Upstate Medical University letter head lists various specialties within the Department of Orthopedic Surgery.  Dr. Loftus is listed under the heading of "Central New York Hand Center," and Dr. Cannizzaro is listed under the heading "Sports Medicine." *See* T. 152.

report then states that "[plaintiff's] major injury *at that point* was a left hand injury, but shortly thereafter he noted persistent left shoulder pain with activity." (T. 154) (emphasis added).  January 16, 2003 is clearly *not* the date that plaintiff injured his hand, and it is unclear whether the doctor's date is incorrect or whether plaintiff had another car accident on January 16, 2003 in which he injured his shoulder.  Dr. Cannizzaro also noted that plaintiff's "surgical history" included not only the hand surgery, but also left knee surgery. (T. 154).

Dr. Cannizzaro stated that plaintiff had no complaints of neck pain or right shoulder pain. (T. 154).  X-rays of plaintiff's left shoulder showed minimal AC joint degenerative disease, and a well-maintained glenohumeral joint. (T. 154, 156).  Dr. Cannizzaro's diagnosis was "probable" left rotator cuff tendinitis, "secondary to the motor vehicle accident." (T. 154).  Dr. Cannizzaro stated that, after discussing the options with plaintiff, it was determined that plaintiff would continue with physical therapy, and if there was no improvement in six weeks, they would consider steroid injections or an MRI. (T. 154-55).

On May 1, 2003, Dr. Cannizzaro stated that plaintiff reported improvement in his left shoulder, and plaintiff stated that he had been "faithful with his conservative program." (T. 153).  The doctor also stated that based on his examination of May 1, 2003, he believed that plaintiff's tendinitis was improving, and he had *not* suffered a rotator cuff tear.  On June 3, 2003, Dr. Cannizzaro stated that plaintiff noted improvement, and although he still had pain, his night pain had improved "dramatically." (T. 152).  Dr. Cannizzaro's June 3 examination showed good range of

13

motion, mild cuff tenderness, and excellent strength. (T. 152).  Dr. Cannizzaro' plan was for plaintiff to continue his rehabilitation program. *Id.*  A hand-written notation at the bottom of Dr. Cannizzaro's June 3, 2003 report indicates that plaintiff did not appear for his July 29, 2003 appointment.

Plaintiff also has a treating family practice physician, Dr. Harry Black.  The record contains Dr. Black's treatment notes from April 1, 2003[8] until March 12, 2004. (T. 157-60).  On April 1, 2003, Dr. Black stated that plaintiff was taking Glucotrol for his diabetes, and noted that plaintiff had a severe motor vehicle accident in "January" resulting in his being out of work with a "crushed left hand."[9]  Dr. Black noted that plaintiff was complaining about numbness in his legs, and that the legs seemed to be weak. (T. 157).  Dr. Black stated that these symptoms might be caused by diabetic neuropathy and stated that plaintiff might need Neurontin. (T. 157).

On May 14, 2003, plaintiff was still complaining of the numbness and weakness in his legs. (T. 158).  Dr. Black prescribed the Neurontin, and on July 11, 2003, Dr. Black stated that the Neurontin resulted in "definite improvement." (T. 158). However, at the July 11, 2003 examination, plaintiff told Dr. Black that plaintiff was having a lot of pain in his knees. (T. 158).  Plaintiff requested a "Kenalog" injection, but Dr. Black believed that this medication might raise plaintiff's blood sugar. (T.

---

[8] The notes actually begin with part of a note from September 9, 2002 and another note from November 22, 2002. (T. 157).  However, the September date is prior to plaintiff's motor vehicle accident and is not relevant to this decision, and the November 22, 2002 notation simply indicates that a prescription was called in for plaintiff on that date.

[9] Once again, it appears that the date of the accident is incorrect.

158).  Dr. Black's diagnosis was degenerative arthritis in plaintiff's knees, and he stated that plaintiff continued to be totally disabled from the crush injury of his left hand on 11/16/02."[10] *Id.*

On December 1 and 2, 2003, Dr. Black performed a "complete physical" on plaintiff. (T. 158-59).  Although at the time, plaintiff had a respiratory infection, the doctor's other findings appeared to be normal. (T. 159).  On January 26, 2004, Dr. Black stated that plaintiff was tolerating his Glucotrol without problem, and that if plaintiff could keep his sugars down, the doctor would defer having plaintiff test his sugar daily.[11] (T. 159).  On February 23, 2004, Dr. Black stated that plaintiff was "doing well" except for a lot of "reflux." (T. 160).  The doctor planned to prescribe Nexium for the reflux, and stated that plaintiff's current medications were Bextra, Neurontin, Glucotrol, and Viagra. (T. 160).

The last progress note from Dr. Black is dated March 12, 2004, stating that plaintiff was "in for Social Security Disability.  With his diabetes and his severe injury [sic] left hand, he is totally disabled and he is trying to get Social Security Disability." (T. 160).  The record also contains a form entitled "Medical Source Statement of Ability to do Work Related Activities (Physical),"[12] completed by Dr. Black on March 16, 2004. (T. 190-93).  This form indicates that plaintiff could lift and carry less than

---

[10] This is the correct date of plaintiff's accident.

[11] The doctor stated that plaintiff did not wish to test his sugar daily. (T. 159).

[12] The court notes that this document is a form in which the doctor indicates a claimant's physical limitations by checking the appropriate boxes on the form.  This form is also often referred to as a Residual Functional Capacity (RFC) evaluation.

ten pounds and could stand and walk less than two hours in an eight hour work day. (T. 190). Dr. Black also checked the box on the form, stating that plaintiff could sit less than six hours in an eight hour work day and would have to alternate between sitting and standing. (T. 191). Dr. Black also stated that plaintiff was limited in his ability to push and pull with both his upper and his lower extremities. (T. 191).

The next question on the form asks what medical or clinical findings supported the doctor's opinions regarding plaintiff's abilities, and the answer to this question consists of one typewritten line, stating that the basis for all the above limitations was "[c]onsequential back injury due to altered gait." (T. 191). Dr. Black also checked boxes indicating that plaintiff could never climb, balance, kneel, crouch, crawl, or stoop, but then did not answer the question regarding what medical or clinical findings supported these conclusions. (T. 191).

Dr. Black then indicated on the form that plaintiff would be limited to occasionally reaching, handling, fingering, and feeling, but then did not explain the medical or clinical findings that supported this conclusion. (T. 192). Finally, Dr. Black noted that plaintiff had no environmental limitations, including temperature. (T. 193).

On February 19, 2003, plaintiff was consultatively examined by Dr. Myra Shayevitz, of Internal Medicine Associates, P.C. (T. 148-51). Dr. Shayevitz's report was written prior to plaintiff's 1994 hand surgery and before plaintiff's referral to Dr. Cannizzaro for his shoulder pain. In her report, Dr. Shayevitz reviewed plaintiff's medical history, including his hand injury, diabetes, left shoulder, and left knee pain.

(T. 148).  Dr. Shayevitz noted that plaintiff's diabetes had been diagnosed "a year ago," and that his knee pain had been intermittent since a 1995 surgery.  Dr. Shayevitz stated that plaintiff had pain on forward elevation and abduction of the left shoulder. (T. 148).  She noted that he had a twelfth grade, "special education." (T. 149).

Dr. Shayevitz found that plaintiff's right hand and shoulder were completely normal, however, plaintiff could not "really use the left hand at all," and the left shoulder was tender. (T. 150).  Plaintiff had 70 degrees of forward flexion in the spine; and external rotation and lateral flexion of the spine were at 10 degrees. Plaintiff had full rotary movements of the spine and no spinal or paraspinal tenderness. *Id.*  There was no spasm, but straight leg raising on the left side caused pain at 30 degrees.  There was full range of motion in the hips, knees, and ankles bilaterally. (T. 150).

Dr. Shayevitz's diagnoses were status-post significant injury to the left hand, forearm, and wrist; left shoulder injury; non-insulin dependent diabetes; and status-post old left knee injury with *some* residual symptoms and findings. (T. 151) (emphasis added).  Dr. Shayevitz stated that plaintiff's prognosis was "guarded" and that there might be *some* problem with *very prolonged* hours of sitting, standing, walking, and stair climbing, but that plaintiff's *chief* problem was that he could not use his left arm or hand. (T. 151).

On May 10, 2004, plaintiff was examined by Dr. T. Gerald Reap, Ph. D. (T. l82-83).[13]  Dr. Reap, a Vocational Rehabilitation Counselor, administered two psychological tests to the plaintiff: the Wide Range Achievement Test R-3 and the Slosson Intelligence Test-Revised.  Dr. Reap stated that the results of plaintiff's Wide Range Achievement Test showed that he had severe learning problems that limited his ability to read and spell. (T. 182).  The results of the Achievement Test also showed that plaintiff could perform only the most basic arithmetic operations. *Id.*  The Intelligence Test results showed that plaintiff was a "slow learner" who would have difficulty with any formal training and would learn best by "hands-on" demonstration. *Id.*  Dr. Reap concluded that based on plaintiff's reading and spelling subtests, he would be considered "functionally illiterate." *Id.*

Plaintiff underwent another orthopedic consultative examination after the ALJ hearing.  That examination was performed on June 10, 2004 by Dr. Kalyani Ganesh, of Industrial Medicine Associates, P.C., and her report was incorporated into the record. (T. 208-11).  On June 14, 2004, Dr. Ganesh completed a Residual Functional Capacity Evaluation. (T. 212-15).  Dr. Ganesh's examination showed that plaintiff's gait was normal, and he could walk on his heels and toes without difficulty. (T. 209).  Plaintiff's right hand and finger dexterity were intact; he could not bend the left index finger and could only partially bend the left index finger. (T. 209).  Dr. Ganesh stated that plaintiff was able to use buttons, a zipper, and Velcro "primarily" with the right

---

[13] Duplicates of Dr. Reap's report appear at pages 197-98, 227-28, and 244-45.  Each report has Dr. Reap's Curriculum Vitae attached to it. (T. 184-88, 199-203, 229-33, and 246-50).

hand, and that he had difficulty tying a bow, "but he did manage." *Id.* Plaintiff was not able to oppose the left thumb to the index finger. *Id.*

Plaintiff's cervical, thoracic, and lumbar spine areas were normal. (T. 209-10). He had full flexion, extension, lateral flexion, and rotary movements bilaterally of all three areas. *Id.* There was no pain, spasm, tenderness, or trigger points in any of these areas. *Id.* Straight leg raising test was negative bilaterally. (T. 210). Plaintiff had a full range of motion of the forearms, elbows, right wrist, and no sensory abnormalities, or muscle atrophy in the upper extremities. (T. 210).

Plaintiff had a full range of motion in his hips, knees, and ankles. (T. 210). Strength was 5/5 in the proximal and distal muscles of his lower extremities bilaterally. There was no muscle atrophy and no sensory abnormality in plaintiff's lower extremities, and his reflexes were "physiologic and intact." (T. 210). Dr. Ganesh concluded that plaintiff would have no gross limitation to sitting, standing, walking, climbing, bending, or the use of his right hand. (T. 210). Dr. Ganesh stated that plaintiff had a "moderate to severe degree of limitation" in the use of his left hand. *Id.*

In her RFC evaluation, Dr. Ganesh found that plaintiff could frequently lift and carry 20 pounds, but had no limitations in standing, walking or sitting. (T. 212-13). Plaintiff was "limited" in his ability to push or pull with his left hand. (T. 213). Although plaintiff's balancing, kneeling, crouching, crawling, and stooping would not be affected, Dr. Ganesh believed that climbing would pose a high risk due to the limited use of plaintiff's left hand. (T. 213). The only manipulative limitation cited

was a limitation on "fingering," and Dr. Ganesh indicated on the form that plaintiff could finger "frequently." (T. 214).

**4.    New and Material Evidence**

The Social Security Act provides that a court may ***remand*** a case to the Commissioner to consider additional evidence, but only if the evidence is new, material, and there is good cause for failure to incorporate that evidence into a prior proceeding. 42 U.S.C. § 405(g)(sentence six). The Second Circuit has developed a three-part showing that is required to support a sentence six remand. *Tirado v. Bowen*, 842 F.2d 595, 597 (2d Cir. 1988). First, the evidence must be "new" and not merely cumulative of what is already in the record. *Id.* (citing *Szubak v. Secretary of Health & Human Services*, 745 F.2d 831, 833 (3d Cir. 1984)).

Second, in order for the new evidence to be "material," it must be ***both relevant to the claimant's condition during the time period for which benefits were denied and probative.*** *Id.* (citing *Cutler v. Weinberger*, 516 F.2d 1282, 1285 (2d Cir. 1975)). The Second Circuit has also held that the concept of "materiality" requires a finding that there is a reasonable possibility that the new evidence would have influenced the Commissioner to decide the claimant's application differently. *See Jones v. Sullivan*, 949 F.2d 57, 60 (2d Cir. 1991). Finally, the plaintiff must show that there is good cause for failing to present the evidence earlier. *Lisa v. Secretary of the Dep't of Health & Human Services*, 940 F.2d 40, 43 (2d Cir. 1991)(quoting *Tirado*, 842 F.2d at 597).

In this case, plaintiff's counsel has submitted additional medical reports that she argues justify a remand in this case. (Dkt. No. 15). These records include a November 10, 2005 report of Norman J. Lesswing, Ph. D., a Licensed Clinical Psychologist. Plaintiff's counsel has also submitted several reports authored by Psychiatrist, Saundra Barnett-Reyes, M.D., beginning in August of 2005.

Dr. Lesswing performed a psychological evaluation and administered the Wechsler Abbreviated Scale of Intelligence Test; the Wide Range Achievement Test-3; and the Minnesota Multiphasic Personality Inventory-2. In the "Background" section of his report Dr. Lesswing notes that in addition to plaintiff's 2002 car accident, he was involved in another motor vehicle accident in *July of 2005* in which he experienced "whiplash" and another motor vehicle accident in *August of 2005* in which plaintiff's car was demolished. Dr. Lesswing noted that plaintiff stated that his "symptoms were exacerbated by the two recent accidents."

Plaintiff told Dr. Lesswing that plaintiff had a learning disability throughout school and that he was in a "special program," but that he did finish high school. After administering the testing, Dr. Lesswing concluded that plaintiff remained functionally illiterate and has a severe learning disability. Dr. Lesswing stated that plaintiff has Borderline Intellectual Functioning, with an estimated Full Scale IQ of 78. Dr. Lesswing concluded that plaintiff was not a good candidate for vocational rehabilitation and that his depression, pain, and posttraumatic stress symptoms imposed a moderate compromise to his overall adjustment and limited his ability to function beyond carrying out basic activities of daily living.

Dr. Lesswing stated that in addition to plaintiff's physical limitations, "he reported mood and anxiety symptoms for which he *recently* sought psychiatric consultation from Dr. Barnett-Reyes." Plaintiff's "new" evidence contains many progress notes by Dr. Barnett-Reyes. Dr. Barnett-Reyes concludes that plaintiff is markedly anxious, extremely depressed, and has had this condition since his accident of November *6*, 2002.[14]

Dr. Barnett-Reyes's reports also contain a Mental Source Statement of Ability to do Work-Related Activities (Mental) in which the doctor states that plaintiff has marked or extreme limitations in various categories of understanding and remembering instructions. The doctor also finds that plaintiff has marked or extreme limitations in his abilities to respond appropriately to co-workers and work pressures. The doctor states that her opinion of these limitations is based upon plaintiff's agitation and confusion due to the acute symptoms of his Post Traumatic Stress Syndrome.

The above reports are technically "new" because they were not written at the time of the agency's decision. However, Dr. Lesswing's assessment of plaintiff's functional illiteracy is merely cumulative of Dr. Reap's assessment. Dr. Lesswing certainly appears to have conducted additional testing, however, the additional information relating to plaintiff's intelligence would not have affected the ALJ's decision. The rest of Dr. Lesswing's report actually supports a finding that the report does *not* relate to the time period in question. Dr. Lesswing states that in addition to

---

[14] The court assumes that Dr. Barnett-Reyes means November 16, 2002.

the 2002 accident, plaintiff suffered **two more motor vehicle accidents** in 2005, one in

which his car was **completely demolished**.  It is unclear whether these additional

accidents could have triggered any symptoms of Posttraumatic Stress Disorder since

there was **absolutely no evidence** of this in the existing record.  Plaintiff did not seek

psychiatric treatment until **2005**.  Dr. Reyes's statement that this condition has existed

since plaintiff's accident of 2002 is not supported by anything in the record and is

does not take into account the possible effects of the more recent accidents.

Plaintiff has **never** claimed a mental impairment, other than his "learning

disability" in **any** of the previous documents in the record, including his Social

Security application and the questionnaires to which he responded when applying for

benefits.  Plaintiff **never** mentioned any mental impairments at the hearing when

discussing his impairments with the ALJ.  Thus, this court cannot find that the

evidence submitted by plaintiff in the motion to remand meets the standard of "new

and material evidence" because it does **not** relate to the time period in question.  Thus

the court recommends denying plaintiff's motion to remand and may proceed to

consider whether the ALJ's decision was supported by substantial evidence based on

the evidence in the existing record.

**5.**     <u>**Treating Physician**</u>

The medical conclusions of a treating physician are controlling if well-

supported by medically acceptable clinical and laboratory diagnostic techniques and

are not inconsistent with the other substantial evidence in the record.  20 C.F.R. §§

404.1527(d)(2); 416.927(d)(2).  *See also Schaal v. Apfel*, 134 F.3d 496, 503 (2d Cir.

1998); *Rosa v. Callahan*, 168 F.3d 72, 78-79 (2d Cir. 1999). An ALJ may not arbitrarily substitute his own judgment for competent medical opinion. *Rosa v. Callahan*, 168 F.3d at 79 (citations omitted). If the treating physician's opinion is not given "controlling weight," the ALJ must assess the following factors to determine how much weight to afford the opinion: the length of the treatment relationship, the frequency of examination by the treating physician for the condition(s) in question, the medical evidence supporting the opinion, the consistency of the opinion with the record as a whole, the qualifications of the treating physician, and other factors tending to support or contradict the opinion. 20 C.F.R. §§ 404.1527(d)(2-6); 416.927(d)(2-6). Failure to follow this standard is a failure to apply the proper legal standard and is grounds for reversal. *Barnett v. Apfel*, 13 F. Supp. 2d 312, 316 (N.D.N.Y. 1998) (citing *Johnson v. Bowen*, 817 F.2d at 985).

In this case, plaintiff claims that the ALJ improperly rejected the RFC evaluation submitted by Dr. Black, plaintiff's treating Family Practice physician. Dr. Black's March 16, 2004 RFC evaluation stated that plaintiff could lift only ten pounds with both hands, could only stand and walk for two hours in an eight hour day, could sit less than six hours in a eight hour day, and would have to alternate sitting and standing. (T. 190-93). The ALJ rejected this assessment because it was inconsistent with other substantial evidence of record, including the consultative examinations of Dr. Shayevitz and Dr. Ganesh and inconsistent with plaintiff's own assessment of the amount of weight that he could lift with his right hand. (T. 20-21).

24

There is no question that the use of plaintiff's left hand is limited.  Plaintiff himself testified at the hearing, however, that he could probably lift up to 20 pounds with his ***right*** hand. (T. 270).  Both Dr. Shayevitz and Dr. Ganesh found that plaintiff's right side was completely normal, and that his strength was 5/5 on the right side. (T. 150, 209).  On February 19, 2003, Dr. Shayevitz found that plaintiff might have "***some***" problem with "***prolonged hours***" of sitting, standing, walking and stair climbing, but that his "chief problem" was the inability to use his left hand. (T. 151)(emphasis added).  By the time that Dr. Ganesh examined plaintiff in June of 2004, she stated that plaintiff had "no gross limitations" in sitting, standing, walking, climbing, bending, or in the use of his right hand. (T. 210).

Plaintiff's counsel argues that Dr. Black did supply an underlying rationale for his RFC, and that Dr. Black's opinion is based upon plaintiff's diabetes, diabetic neuropathy and his serious hand injury. Plaintiff's Brief at 12.  Interestingly, however, in Dr. Black's RFC evaluation, when asked the cause for the limitations he placed on plaintiff's abilities, Dr. Black stated that the basis for plaintiff's limitations was a "consequential back injury due to altered gait." (T. 191).  Dr. Black does not mention diabetic neuropathy, plaintiff's hand injury, plaintiff's old knee injury, or even plaintiff's alleged shoulder injury as bases for the stated limitations.  In addition, although Dr. Black states that plaintiff is limited in his ability to push and pull with both upper and lower extremities, he does not answer the question requiring specification of a basis for this finding. (T. 191).

25

After the "postural limitations" section of the RFC in which Dr. Black states that plaintiff can **never** climb, balance, crouch, crawl, or stoop, there is a place in the form to explain the basis for the doctor's answer.  However, Dr. Black did not fill in this space with **any** explanation. (T. 191).  Thus, although plaintiff's counsel argues that Dr. Black "filled in an assessment in which he clearly outlined" plaintiff's limitations, this court finds that Dr. Black did not state the bases for plaintiff's limitations, did not complete the RFC, and did not even mention the impairments that plaintiff alleges were the doctor's "underlying rationale" for these limitations.

Both Dr. Shayevitz and Dr. Ganesh found plaintiff's **gait** to be normal, and he could walk on his heels and toes without difficulty. (T. 149, 209).  Although Dr. Black found on April 1, 2003 and May 14, 2003, that the alleged tingling and weakness in plaintiff's legs was due to diabetic neuropathy,(T. 157-58), he prescribed Neurontin for plaintiff. *Id.*  By July 11, 2003, Dr. Black stated that there was "definite improvement" with the Neurontin and that there was less tingling and weakness in plaintiff's legs. (T. 158).  Instead, on July 11, 2003, plaintiff was complaining of pain in his knees. (T. 158).  Dr. Black **never** mentions a **back** injury due to altered gait in his progress notes.   There is also no indication that plaintiff's diabetes was not being controlled with his medication.

Although plaintiff complained to Dr. Black in April and May of 2003 that his legs were weak, in June of 2004, Dr. Ganesh found that plaintiff had a full range of motion in his hips, knees, and ankles, and that the strength in plaintiff's lower extremities was 5/5 in proximal and distal muscles bilaterally. (T. 210).  There was no

26

muscle atrophy, no sensory abnormality, no joint effusion, inflammation, or instability. (T. 210).  Plaintiff's reflexes were physiologic and equal. (T. 210).  Dr. Ganesh's RFC evaluation was consistent with his physical examination, and consistent with the opinion that plaintiff's ***main*** problem was the limitation on the use of his left arm.

Plaintiff's counsel argues that Dr. Ganesh did not mention plaintiff's diabetes, did not "know the plaintiff had diabetes," and that was probably why Dr. Ganesh did not find diabetic neuropathy. Plaintiff's Brief at 13.  Counsel's argument is ***completely*** incorrect.  Dr. Ganesh specifically stated that "Claimant has diabetes and takes 2 pills per day." (T. 208).  Dr. Ganesh also listed plaintiff's medications which included Glipizide (Glucotrol) and Neurontin, the medications that plaintiff took for diabetes and the diabetic neuropathy. (T. 208).  Thus, Dr. Ganesh was well aware that plaintiff had diabetes, and plaintiff cannot argue that Dr. Ganesh's medical opinion or RFC must be rejected because it did not include all of plaintiff's impairments.  Thus, the ALJ's decision to reject Dr. Black's RFC evaluation and rely upon Dr. Ganesh's RFC evaluation was supported by substantial evidence in the record.[15]

---

[15] The court notes that plaintiff's counsel states that the ALJ improperly criticized counsel for failing to counter Dr. Ganesh's report at the hearing since Dr. Ganesh's examination was conducted after the hearing.  The court notes that the ALJ's decision is somewhat unclear in this regard and can be interpreted as stating that counsel had the opportunity "at the hearing" to counter the finding that the plaintiff demonstrated normal gait and station, could heel and toe walk without difficulty, and could mount the examination table without difficulty. (T. 21).  Although Dr. Ganesh's report was subsequent to the hearing, and counsel would not have been able to know the contents of that report, the court would point out that in February of ***2003***, Dr. Shayevitz ***also*** found that plaintiff had normal gait, could walk heel and toe without difficulty, and could get on and off the examining table without difficulty. (T. 149).  Thus, any error by the ALJ was harmless and does not affect this court's finding that the decision rejecting Dr. Black's RFC was supported by substantial evidence.

**6.    Vocational Expert**

If a plaintiff's non-exertional impairments "significantly limit the range of work" permitted by the plaintiff's exertional limitations or plaintiff's ability to perform the full range of an exertional category of work is significantly limited in any way, then the ALJ may not use the Medical-Vocational Guidelines exclusively to determine whether plaintiff is disabled. *Bapp v. Bowen*, 802 F.2d 601, 606 (2d Cir. 1986).  If the plaintiff's full range of a particular exertional category of work is significantly limited, then the ALJ must present the testimony of a vocational expert (VE) or other similar evidence regarding the availability of other work in the national economy that plaintiff can perform. *Id.*  A vocational expert may provide testimony regarding the existence of jobs in the national economy and whether a particular claimant may be able to perform any of those jobs given his or her functional limitations. *See Rautio v. Bowen*, 862 F.2d 176, 180 (8th Cir. 1988); *Dumas v. Schweiker*, 712 F.2d 1545, 1553-54 (2d Cir. 1983).

Although the ALJ is initially responsible for determining the claimant's capabilities based on all the evidence,[16] a hypothetical question that does not present the full extent of a claimant's impairments cannot provide a sound basis for the VE's testimony. *See De Leon v. Secretary of Health and Human Services.*, 734 F.2d 930, 936 (2d Cir. 1984); *Lugo v. Chater*, 932 F. Supp. 497, 503-04 (S.D.N.Y. 1996).  The Second Circuit has stated that there must be "substantial record evidence to support

---

[16] *Dumas*, 712 F.2d at 1554 n.4.

28

the assumption upon which the vocational expert based his or her opinion." Dumas, 712 F.2d at 1554.

### A. Plaintiff's Additional Limitations

In his decision, the ALJ stated that due to plaintiff's additional exertional and non-exertional limitations, he could ***not*** perform the full range of light work. (T. 23). Because of the ***additional restrictions*** imposed on plaintiff, the ALJ requested the testimony of Vocational Expert Jay Steinbrenner at the hearing. (T. 279-87).  Plaintiff alleges that the ALJ did not properly analyze the VE's testimony, and that the proper interpretation would require a finding of disability.  Plaintiff quotes the portion of the VE's testimony in which the ALJ asked the VE to consider only the plaintiff's testimony at the hearing, and to give the plaintiff's testimony full credibility. (T. 280-81).  In response to the ALJ's question, the VE stated that based on plaintiff's testimony regarding the "***limited***" use of his non-dominant hand and his "somewhat limited" ability to read and write, there would be no jobs that plaintiff could perform. (T. 281).  The VE also testified that if Dr. Black's RFC were utilized, plaintiff would not be able to perform any work. (T. 281).

The first part of the ALJ's hypothetical question asked the VE to assume that the plaintiff was able to lift ten pounds frequently and up to twenty pounds occasionally with the ***dominant*** hand; but was precluded from lifting or carrying anything with the non-dominant hand. (T. 279).  The plaintiff would have a limited ability to push and pull using the non-dominant upper extremity and a limited ability to push and pull using both lower extremities. (T. 279).  In response to this question,

the VE stated that plaintiff could only perform ten percent of the total light work jobs and no sedentary jobs. (T. 279).

The ALJ then added non-exertional limitations to the hypothetical question and asked the VE to consider that the plaintiff was between 46 and 47 years old, and although he had a high school diploma, his education was more limited than his grade level would indicate. (T. 279).  The plaintiff would not be able to perform any work involving climbing or crawling, and he could only occasionally balance, bend, stoop, kneel, crouch, or squat. *Id.*  The ALJ also included manipulative limitations involving the non-dominant hand. (T. 280).  The plaintiff would have to avoid exposure to moving machinery or unprotected heights, and as a result of his pain and the side effects of his medication, he would have a moderate limitation on the ability to concentrate, maintain attention for extended periods, and keep pace. (T. 280).

The VE testified that, given the limitations expressed by the ALJ, plaintiff would only be able to perform ten percent of the 1400 jobs available. (T. 280).  The VE then specified that an example of one of those jobs would be an usher or a lobby attendant. (T. 280).  This job is considered "light work" because of the standing requirement, and there would be 130 of these jobs in the "Syracuse area" and 84,000 nationwide. (T. 280).

The ALJ **did** include limitations on the use of plaintiff's non-dominant hand in his hypothetical question.  Lifting and carrying were completely precluded with the left hand, while the ability to push and pull with the non-dominant upper extremity would be "limited." (T. 279).  The ALJ's hypothetical was consistent with Dr.

Ganesh's RFC evaluation and with Dr. Ganesh's consultative examination.  The ALJ rejected plaintiff's credibility to the extent that he alleged greater limitations on the use of his left arm as well as a greater limitation on plaintiff's ability to stand.[17]  The ALJ even included a consideration of limitations that might be caused by pain and by the side effects of plaintiff's medication. (T. 280).  As stated above, the ALJ's decision to reject Dr. Black's RFC was supported by substantial evidence, thus, the ALJ's hypothetical question contained the appropriate limitations, and the VE found that although plaintiff's limitations would preclude a great deal of the light work jobs, there would be some jobs that he could physically perform.

Plaintiff argues that even Dr. Shayevitz found that plaintiff could not use his left hand at all.  The ALJ considered Dr. Shayevitz's restrictions and Dr. Black's restrictions and found that Dr. Ganesh's assessment was more accurate since at the time of Dr. Ganesh's examination, plaintiff's condition after surgery had improved with time and medication. (T. 21).  The court does note that the first page of Dr. Ganesh's RFC evaluation does not specify that plaintiff can lift 20 pounds only with his right hand, (T. 212), however, the second page states "limited use of left hand," (T. 213), and the ALJ specifically finds that plaintiff can *only* lift with his right hand. (T. 22).

Plaintiff's counsel also argues that plaintiff's educational limitations were not properly considered.  Plaintiff argues that Dr. Reap's report shows that plaintiff is

---

[17] The position of usher or lobby attendant required standing 75% of the time. (T. 282).  Dr. Ganesh found no limitation on plaintiff's ability to stand. (T. 212).

functionally illiterate, and if plaintiff is functionally illiterate, the VE's opinion would have been that plaintiff could not perform any work.  While it is true that Dr. Reap states that plaintiff is functionally illiterate, plaintiff ***never*** indicated such a limitation in ***any*** of the forms that he completed for disability purposes.[18]  He does have a high school diploma, even though it appears that he may be more limited than his grade level would indicate.  However, the ALJ ***included that additional limitation*** in his hypothetical question.

Plaintiff performed his previous job in the warehouse with the same educational limitations.  He testified at the hearing that he could "read a little bit of the sports page." (T. 263).  He then stated that he did not "read that much." (T. 263).  He testified that he could read street signs, and that he had no limitation on his driver's license, although he testified that he took an "oral" test for his license. (T. 261).  Plaintiff stated that he "got good" at mathematics, and in a "Function Report," dated February 11, 2003, plaintiff reported that he was able to pay his bills, handle a savings account, and use a checkbook. (T. 90, 264).   In the same report, plaintiff stated that he could follow both oral and ***written*** instructions. (T. 92).

Plaintiff's own statements, both written and oral are inconsistent with the degree of restriction that he now claims and are inconsistent with Dr. Reap's assessment of plaintiff's abilities.  The ALJ's decision to find that plaintiff was not as limited as he alleged or as Dr. Reap's assessment would indicate is supported by substantial

---

[18] In fact, in his disability report, plaintiff indicated that he finished the 12th grade and checked the box stated that he did ***not attend special education classes***. (T. 71).

evidence and is based upon plaintiff's prior work and plaintiff's own statements in the record.

### B.  Number of Jobs

Plaintiff also argues that the number of jobs cited by the VE were not sufficient to constitute a "significant number."  As stated above, the VE identified an usher or lobby assistant as a possible job for plaintiff.  The VE testified that there were 130 of these jobs in the "Syracuse area" and 84,000 nationally. (T. 280).  The VE also testified that this was only one example of the jobs that plaintiff could perform. (T. 280).  It is true that plaintiff's additional impairments reduced the available jobs to ten percent of the total number of light work jobs available, but the VE testified that the total number was 1,400. (T. 280).  Ten percent of 1,400 is still 140 different jobs.  Within that number of jobs, *one* of those jobs was the usher or lobby attendant position. (T. 280).

Plaintiff first argues that the Social Security Rulings provide that an individual must be able to perform a wide range of light work, and therefore, if he can only perform ten percent of the jobs he cannot work. Plaintiff's Brief at 18.  Counsel misstates the regulations.  In order to use the Medical Vocational Guidelines (the Grid) exclusively, one must be able to do a wide range of a particular exertional category of work.  However, when one's range of work is substantially limited, then the Guidelines may not be used exclusively, and the ALJ must rely on a VE. *Bapp*, 802 F.2d at 606.  That is what the ALJ did in this case.  Because of plaintiff's additional restrictions, lessening the range of light work that he could perform, the

ALJ could not use the Grid.  Thus, plaintiff's argument that he could not perform a "wide" range of light work was already taken into consideration when the ALJ called the VE to testify.

Plaintiff next argues that 130 jobs in the Syracuse area and 84,000 nationally is an insufficient number of jobs.  Plaintiff cites *Franklin v. Apfel*, 8 F. Supp. 2d 227 (W.D.N.Y. 1998) in which the court remanded the case in order to determine whether 480 jobs in the Buffalo area and 80,000 jobs nationally was a "significant" number. The court found the VE's testimony "not fully certain" that these were significant numbers. 8 F. Supp. 2d at 234.  In *Franklin*, the VE testified that the number of jobs "locally" might not be a "realistic employment pool." *Id.* at 233-34.  In *Franklin*, the court also discussed the fact that there were no such positions in the county in which plaintiff resided, and that the closest jobs were 65 to 75 miles away. *Id.* at 234.

However, this court points out that the Social Security regulations ***specifically*** state that "other" work must exist in "significant numbers in the national economy (***either*** in the region where you live ***or*** in several regions in the country)." 20 C.F.R. § 404.1561(c)(emphasis added).  The regulations also state that it does ***not*** matter whether work exists in the immediate area in which the plaintiff lives. 20 C.F.R. § 404.1566(a)(1).  One occupation in significant numbers is sufficient to meet the standard. 20 C.F.R. § 404.1566(b).

The court in *Carle v. Barnhart*, 2005 U.S. Dist. LEXIS 30499, *7-8 (D. Me. Nov. 30, 2005), *report-recommendation adopted by* 2005 U.S. Dist. LEXIS 35304 (D. Me. Dec. 20, 2005) stated that the determination of whether jobs exist in "significant

numbers" is a determination to be made by the Commissioner, not the VE. Courts have found significant numbers of jobs to exist in local or regional economies at numbers of 200 or less. *See Craigie v. Bowen*, 835 F.2d 56, 58 (3d Cir. 1987)(200 jobs in the region); *Allen v. Bowen*, 816 F.2d 600, 602 (11th Cir. 1987)(174 jobs in the local area, 80,000 nationwide).

In *Dumas v. Schweiker*, 712 F.2d 1545, 1549 (2d Cir. 1983), the VE testified that there were 150 jobs available in the plaintiff's region and 112,000 nationwide. Although the issue in *Dumas* was the adequacy of the hypothetical question, the court held first that there was substantial evidence to support the VE's testimony, and then commented that the cited jobs were "abundant in the national economy." *Id.* at 1554. Although certainly, dicta, it appears that the court did not question that the number of jobs cited by the VE was "significant."  Thus, this court finds that the number of jobs cited by the VE in this case meets the requirement of a "significant" number of jobs, and the ALJ's finding that plaintiff can perform other work in the national economy is supported by substantial evidence.

## 7.   **Pain and Credibility**

"An [ALJ] may properly reject [subjective complaints] after weighing the objective medical evidence in the record, the claimant's demeanor, and other indicia of credibility, but must set forth his or her reasons 'with sufficient specificity to enable us to decide whether the determination is supported by substantial evidence.'" *Lewis v. Apfel*, 62 F. Supp. 2d 648, 651 (N.D.N.Y. 1999)(quoting *Gallardo v. Apfel*, No. 96 CIV 9435, 1999 WL 185253, at *5 (S.D.N.Y. March 25, 1999)).  To satisfy the

substantial evidence rule, the ALJ's credibility assessment must be based on a two step analysis of pertinent evidence in the record.  *See* 20 C.F.R. §§ 404.1529, 416.929; *see also Foster v. Callahan*, No. 96-CV-1858, 1998 WL 106231, at *5 (N.D.N.Y. March 3, 1998).

First, the ALJ must determine, based upon the claimant's objective medical evidence, whether the medical impairments "could reasonably be expected to produce the pain or other symptoms alleged...."  20 C.F.R. §§ 404.1529(a), 416.929(a). Second, if the medical evidence alone establishes the existence of such impairments, then the ALJ need only evaluate the intensity, persistence, and limiting effects of a claimant's symptoms to determine the extent to which it limits the claimant's capacity to work. *Id.* §§ 404.1529(c), 416.929(c).

When the objective evidence alone does not substantiate the intensity, persistence, or limiting effects of the claimant's symptoms, the ALJ must assess the credibility of the claimant's subjective complaints by considering the record in light of the following symptom-related factors: (1) claimant's daily activities; (2) location, duration, frequency, and intensity of claimant's symptoms; (3) precipitating and aggravating factors; (4) type, dosage, effectiveness, and side effects of any medication taken to relieve symptoms; (5) other treatment received to relieve symptoms; (6) any measures taken by the claimant to relieve symptoms; and (7) any other factors concerning claimant's functional limitations and restrictions due to symptoms. *Id.* §§ 404.1529(c)(3), 416.929(c)(3).

In this case, the ALJ found that plaintiff's allegations regarding his limitations were "not totally credible." (T. 24). The ALJ did not question that plaintiff had some pain, however, the ALJ found that plaintiff was not as limited as he alleged. The ALJ stated that he considered plaintiff's pain when making the RFC assessment. (T. 22). The court notes that in June of 2003, Dr. Cannizzaro stated that plaintiff's shoulder was improving, and that although he still had pain, he had good range of motion, only mild cuff tenderness, and excellent strength. (T. 152). In November of 2003, Dr. Loftus stated that plaintiff's wrist range of motion was "functional" and "painless." (T. 163). After the April 2004 surgery, Dr. Loftus stated that plaintiff was "doing great" and had made "significant strides" in physical therapy. (T. 206).

Dr. Ganesh's narrative report of June 10, 2004 is consistent with a finding that plaintiff's pain is not as limiting as he alleges. Dr. Ganesh's clinical findings clearly included an analysis of plaintiff's pain. (T. 209-10). When Dr. Ganesh reviewed plaintiff's cervical spine, the doctor noted, among other findings, that plaintiff had no "cervical or paracervical pain or spasm." (T. 209). When discussing plaintiff's lumbar and thoracic spine, Dr. Ganesh stated that she found no spinal or paraspinal "tenderness" and found full ranges of motion and no muscle atrophy in plaintiff's lower extremities. (T. 210). Thus, the ALJ's finding that plaintiff's pain was not as limiting as he alleged is supported by substantial evidence in the record.

## 8. **Medical Vocational Guidelines**

Finally, plaintiff argues that he meets the requirements of "Vocational Guideline 201(h)(i)." As stated above, plaintiff's counsel mis-cites this section of the

37

regulations.  The language cited by plaintiff's counsel appears at 20 C.F.R. Pt. 404, Subpt. P, App. 2 § 201.00(h)(1).  This is an explanatory section that appears in the **introduction** to the Medical Vocational Guidelines for individuals who are restricted to **sedentary** work.  This section explains that although the term "younger individual" refers to anyone between the ages of 18 and 49, for those individuals who are 45-49, age is a less advantageous factor than for those who are 18-44.  *Id.*  For this reason, a finding of disabled is warranted if the individual is 45-49; is restricted to sedentary work; is unskilled or has no transferable skills; has no past relevant work or cannot perform his past relevant work; and cannot communicate in English or cannot speak or understand English, or if able to speak and understand English, cannot read or write in English.

The court would also point out that this section is not a "guideline" in itself.  The factors stated above appear in the Medical Vocational Guidelines at § 201.17.  In any event, this plaintiff does **not** meet the criteria for disability under this section.  First, plaintiff is **not limited to sedentary work**.  The ALJ specifically found that plaintiff's RFC is for a restricted range of light work.[19]  Additionally, although Dr. Reap states that plaintiff is "functionally illiterate", the plaintiff clearly has some reading and writing skills, by his own testimony.  This section refers to those who may not be able to communicate in English, perhaps because English is not their first language.

---

[19] This court has specifically found that the ALJ's RFC determination is supported by substantial evidence.

Finally, the court would point out that the ALJ did not use the Medical Vocational Guidelines alone to determine that plaintiff could perform other work. The ALJ used the services of the vocational expert. Plaintiff was given more individualized consideration because of his additional restrictions. Thus, the section cited by plaintiff does not apply in his case, and the ALJ's determination is supported by substantial evidence.

**WHEREFORE,** based on the findings in the above Report, it is hereby

**RECOMMENDED,** that plaintiff's motion to remand for consideration of "new and material" evidence (Dkt. No. 15) be **DENIED**, and it is

**RECOMMENDED,** that the decision of the Commissioner be **AFFIRMED** and the complaint be **DISMISSED**.

Pursuant to 28 U.S.C. § 636(b)(1), the parties have ten days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. **FAILURE TO OBJECT TO THIS REPORT WITHIN TEN DAYS WILL PRECLUDE APPELLATE REVIEW.** *Roldan v. Racette*, 984 F.2d 85 (2d Cir. 1993) (citing *Small v. Secretary of Health and Human Services*, 892 F.2d 15 (2d Cir. 1989)); 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72, 6(a), 6(e).

Dated: June 30, 2006

_____
Hon. Gustave J. DiBianco
U.S. Magistrate Judge