**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**
_____

**DOUGLAS DIXIE,**

        **Plaintiff,**

v.
        **5:05-CV-345**
        **(NAM/GJD)**

**COMMISSIONER OF SOCIAL SECURITY,**

        **Defendant.**
_____

APPEARANCES:         OF COUNSEL:

McMahon, Kublick & Smith         Jennifer Gale Smith, Esq.
500 South Salina Street
Suite 816
Syracuse, NY 13202
*For Plaintiff*

Glenn T. Suddaby         William H. Pease
United States Attorney for the         Assistant United States Attorney
Northern District of New York
100 South Clinton Street
Syracuse, NY 13261-7198
*For Defendant*

**Hon. Norman A. Mordue:**

### MEMORANDUM-DECISION AND ORDER

**I.     INTRODUCTION**

    Plaintiff Douglas Dixie brings the above-captioned action pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3) of the Social Security Act, seeking review of the Commissioner of Social Security's decision to deny his application for Disability Insurance benefits.  The Court referred this matter to United States Magistrate Judge Gustave J. DiBianco for a Report-Recommendation pursuant to 28 U.S.C. § 636(b)(1)(B) and Local Rule 72.3(d).  Magistrate Judge DiBianco

recommended that this Court affirm the Commissioner's decision denying disability benefits and dismiss the complaint. Presently before the Court are plaintiff's objections to the Report and Recommendation.

## II.     FACTUAL BACKGROUND

Neither party has objected to Magistrate Judge DiBianco's thorough recitation of the background in this case. Accordingly, the Court adopts the portion of the Report and Recommendation entitled "Facts" in its entirety:

A. Non-Medical Evidence

Plaintiff was born on May 27, 1956 and was 47 years old at the time of the administrative hearing in this case. (T. 56). Prior to November of 2002, plaintiff worked in a frozen food warehouse, preparing food orders for shipment. (T. 255). Plaintiff testified that he would go into the freezer, place the cases of food on a pallet pursuant to the customer's order, and bring the food to the trucks for shipping. (T. 255). On November 16, 2002, plaintiff had a serious car accident in which his left hand was crushed. (T. 120). The accident resulted in the partial amputation of plaintiff's thumb. (T. 112). Plaintiff had two surgeries on his hand at the time of the accident, and a subsequent surgery on April 27, 2004. (T. 112, 194-95).

The record contains a form entitled "Disability Report-Adult," signed by plaintiff on January 30, 2003. (T. 64-73). In this report, plaintiff stated that he completed the 12th grade, and that he did not attend special education classes. (T. 71). Plaintiff also stated that he could read English and write "more than [his] name in English." (T. 64). The form asked plaintiff to state what were the "illnesses, injuries, or conditions" that limited his ability to work. (T. 65). Plaintiff's answer to this question stated only that the limitation on his ability to work was due to the injury to his left hand and wrist, together with the resulting loss of the use of the left hand. (T. 65). The A[dministrative] L[aw] J[udge] found, however, that based on the medical records, plaintiff did have additional severe impairments of a left shoulder disorder and residuals of left knee trauma. (T. 21). Although plaintiff also claims that he has non-insulin dependent diabetes, the ALJ found that plaintiff's diabetes was adequately managed and not "severe." (T. 22).

During the hearing, plaintiff was asked about the reading ability required at his former job. (T. 255-63). Plaintiff stated that as a warehouse worker, he did not have to keep any records himself, but he was given "paperwork" to go through when determining how to fill the pallet. (T. 255). Plaintiff stated that he would have to go into the warehouse and get a certain number of cases, then he would put a "check mark" on the form to indicate that he had completed the task. (T. 255). Plaintiff stated that he did not have to "figure out" any more than that, but did state that he participated in a yearly inventory. (T. 255). Plaintiff testified that in order to complete the inventory, he would be given a "check list," he would

2

go to a specific location with another employee, and they would check to see how many cases were on the pallet. (T. 256).

Plaintiff stated that although he had a high school diploma, he read "very little," and he had a "learning disability." (T. 263). Plaintiff told the ALJ that plaintiff's mother had read plaintiff the notice of the hearing, and that plaintiff could only read a little bit of the "sport's page." (T. 263). Plaintiff stated that he took an oral test for his driver's license, but that he could read street signs. (T. 261). Plaintiff also testified that he did not "read that much," and he could not write even a note or a letter. (T. 263). Finally, plaintiff stated that although he could not write, he could add and subtract and became "pretty good" with numbers. (T. 264).

B. Medical Evidence of Record

Plaintiff's treating physician for his hand and wrist impairments is Dr. Jon Loftus, an orthopedic surgeon. Dr. Loftus performed the surgeries on plaintiff's left hand, beginning with the two surgeries that plaintiff underwent following his November 16, 2002 car accident. (T. 112-31). Dr. Loftus's discharge summary stated that plaintiff was admitted with multiple fractures of the left hand and a near complete amputation of the left thumb. (T. 112). The first surgery was performed on November 16, 2002. (T. 115-17). During the first surgery, Dr. Loftus "pinned" the fractures, realigning the broken bones in plaintiff's hand. (T. 112, 115-17). Dr. Loftus performed the second surgery on November 18, 2002. (T. 113-14). During the second surgery, Dr. Loftus amputated the tip of plaintiff's left thumb. (T. 113-14).

The record contains many subsequent reports by Dr. Loftus. (T. 136-47, 162-68, 194-96, 205-206). After the first surgery, periodic x-rays were taken to check the status of the healing process. (T. 142-47, 167-68). On November 21, 2002, Dr. Loftus stated that plaintiff's wounds were healing nicely, and the x-rays showed very satisfactory alignment. (T. 141). The November 21, 2002 report also stated that plaintiff was beginning to feel pain in his wrist, and Dr. Loftus stated that the pain might have been due to a fracture that he had not seen. (T. 141).

On December 12, 2002, Dr. Loftus referred plaintiff to physical therapy. (T. 140). On January 13, 2003, Dr. Loftus stated that the alignment of plaintiff's fracture was "actually quite impressive." (T. 138). However, plaintiff was still complaining of wrist pain. (T. 138). Dr. Loftus stated that plaintiff's range of motion was "absolutely terrible," but that this was "not surprising." *Id*. Dr. Loftus stated that plaintiff would continue with therapy. *Id*. On February 2, 2003, Dr. Loftus stated that the x-rays still showed "nice" alignment relative to plaintiff's injury which was "quite severe." (T. 137). The x-rays also showed evidence of healing fractures. (T. 137). Plaintiff's finger motion was better, but this was compared to "non-existent" the last time. (T. 137).

On June 6, 2003, Dr. Loftus stated that plaintiff continued to make progress, and that his wrist range of motion was "very good and functional," and although it was not completely painless, the range of motion was better than the doctor thought it was going to be. (T. 166). Dr. Loftus stated that the range of motion would probably be good enough for "day-to-day activities." (T. 166). Dr. Loftus stated that he believed plaintiff's chances of

"meaningful high demand work" with his upper extremities were "poor." (T. 166).

On July 30, 2003, Dr. Loftus stated that plaintiff was "doing fabulously in therapy," that his wrist did not hurt at all, and that plaintiff had good flexion and extension. (T. 166). Although the doctor thought that plaintiff would never be able to bring his index finger and long fingers down all the way to his palm, he was "certainly getting them out of the way when he [went] to make a fist." (T. 166). On September 25, 2003, Dr. Loftus stated that although plaintiff was continuing to make strides, the doctor did not think that plaintiff was ever going to return to his previous work because of the degree of lifting and the low temperature in the warehouse. (T. 164). On November 20, 2003, Dr. Loftus stated that plaintiff's wrist was "functional and painless," and that he would continue to improve in therapy even if his fingers would never be normal. (T. 163).

On January 22, 2004, Dr. Loftus reported that plaintiff had reached a plateau in therapy. (T. 162). Dr. Loftus stated that because of the limitation in the motion of plaintiff's fingers and the shortness of the thumb, plaintiff could not really "oppose [his fingers and thumb]." Id. Dr. Loftus suggested an operation involving "capsulotomies" of the PIP joints of the long fingers. *Id*. This recommendation resulted in plaintiff's surgery of April 27, 2004. The purpose of the surgery on April 27, 2004 was to improve the range of motion in plaintiff's fingers by opening up the joint capsules and also by freeing the tendons in plaintiff's hand that might have adhered to other tissue. (T. 194). Dr. Loftus's operative note from the April 27, 2004 surgery stated that plaintiff's range of motion "dramatically improved compared to preoperatively." (T. 195).

On April 29, 2004, Dr. Loftus noted that plaintiff began a post-surgery therapy program, and on May 7, 2004, Dr. Loftus stated that plaintiff was "doing great." (T. 205, 206). Dr. Loftus noted that plaintiff was making "significant strides" in physical therapy, and the doctor recommended that plaintiff continue "aggressive therapy." (T. 206).

The record also contains the physical therapy notes that are contemporaneous to Dr. Loftus's reports. (T. 133-35). Plaintiff's initial consultation with the physical therapist was on November 21, 2002. (T. 135). Between December 17, 2002 and February 5, 2003, plaintiff had sixteen physical therapy sessions. (T. 133-35). Plaintiff was treated with moist heat and range of motion exercises. *Id*. On January 28, 2003, plaintiff had a slight increase in the range of motion at his fifth finger. (T. 134).

On January 29, 2003, plaintiff reported numbness in his forearm, thumb, and index finger. (T. 133). On January 29, plaintiff also complained of shoulder pain and limitation of movement with internal rotation of his shoulder. (T. 134-33). Shay Klein, the physical therapist stated that an "impingement" test of the shoulder was positive. (T. 133). There was pain and discomfort on palpation of the anterior aspect of the shoulder. External rotation of the shoulder combined with abduction was also painful. *Id*. The therapist noted that plaintiff was going to discuss his shoulder problem with Dr. Loftus on "Monday." *Id*.

The record contains additional physical therapy notes. (T. 169-80). Between February 7, 200[3] and January 2[2], 2004, plaintiff attended sixty one physical therapy sessions. (T. 171-80). Plaintiff's physical therapy focused on his hand and wrist impairment. The treatments included moist heat, wrapping plaintiff's fingers into flexion, and squeezing exercises. *Id*. On July 30, 2003, Physical Therapist Klein noted that Dr. Loftus was pleased with plaintiff's progress, including his wrist movement and forearm movement. (T. 177).

4

The physical therapist also stated that Dr. Loftus noted improvement in the range of motion of plaintiff's fingers into flexion. *Id*. Although the reports indicate some improvement, by December 30, 2003, the physical therapist stated that plaintiff was reporting "no change," and by January 22, 2004, the therapist noted that Dr. Loftus was planning on performing an operation to "release" plaintiff's tendons and his joints. (T. 180).

Because of the pain in plaintiff's left shoulder, he was examined by Dr. John P. Cannizzaro, an orthopedic surgeon, working with Dr. Loftus at Upstate Medical Center in Syracuse, New York. (T. 152-56). The record contains three reports by Dr. Cannizzaro. (T. 154-56). Dr. Cannizzaro's March 27, 2003 report states that plaintiff injured his left shoulder in an motor vehicle accident on "1/16/03." (T. 154). The report then states that "[plaintiff's] major injury at that point was a left hand injury, but shortly thereafter he noted persistent left shoulder pain with activity." (T. 154) (emphasis added). January 16, 2003 is clearly not the date that plaintiff injured his hand, and it is unclear whether the doctor's date is incorrect or whether plaintiff had another car accident on January 16, 2003 in which he injured his shoulder. Dr. Cannizzaro also noted that plaintiff's "surgical history" included not only the hand surgery, but also left knee surgery. (T. 154).

Dr. Cannizzaro stated that plaintiff had no complaints of neck pain or right shoulder pain. (T. 154). X-rays of plaintiff's left shoulder showed minimal AC joint degenerative disease, and a well-maintained glenohumeral joint. (T. 154, 156). Dr. Cannizzaro's diagnosis was "probable" left rotator cuff tendinitis, "secondary to the motor vehicle accident." (T. 154). Dr. Cannizzaro stated that, after discussing the options with plaintiff, it was determined that plaintiff would continue with physical therapy, and if there was no improvement in six weeks, they would consider steroid injections or an MRI. (T. 154-55).

On May 1, 2003, Dr. Cannizzaro stated that plaintiff reported improvement in his left shoulder, and plaintiff stated that he had been "faithful with his conservative program." (T. 153). The doctor also stated that based on his examination of May 1, 2003, he believed that plaintiff's tendonitis was improving, and he had not suffered a rotator cuff tear. On June 3, 2003, Dr. Cannizzaro stated that plaintiff noted improvement, and although he still had pain, his night pain had improved "dramatically." (T. 152). Dr. Cannizzaro's June 3 examination showed good range of motion, mild cuff tenderness, and excellent strength. (T. 152). Dr. Cannizzaro' plan was for plaintiff to continue his rehabilitation program. *Id*. A hand-written notation at the bottom of Dr. Cannizzaro's June 3, 2003 report indicates that plaintiff did not appear for his July 29, 2003 appointment.

Plaintiff also has a treating family practice physician, Dr. Harry Black. The record contains Dr. Black's treatment notes from April 1, 2003 until March 12, 2004. (T. 157-60). On April 1, 2003, Dr. Black stated that plaintiff was taking Glucotrol for his diabetes, and noted that plaintiff had a severe motor vehicle accident in "January" resulting in his being out of work with a "crushed left hand." Dr. Black noted that plaintiff was complaining about numbness in his legs, and that the legs seemed to be weak. (T. 157). Dr. Black stated that these symptoms might be caused by diabetic neuropathy and stated that plaintiff might need Neurontin. (T. 157).

On May 14, 2003, plaintiff was still complaining of the numbness and weakness in his legs. (T. 158). Dr. Black prescribed the Neurontin, and on July 11, 2003, Dr. Black stated that the Neurontin resulted in "definite improvement." (T. 158). However, at the July

11, 2003 examination, plaintiff told Dr. Black that plaintiff was having a lot of pain in his knees. (T. 158). Plaintiff requested a "Kenalog" injection, but Dr. Black believed that this medication might raise plaintiff's blood sugar. (T. 158). Dr. Black's diagnosis was degenerative arthritis in plaintiff's knees, and he stated that plaintiff continued to be totally disabled from the crush injury of his left hand on 11/16/02." *Id.*

On December 1 and 2, 2003, Dr. Black performed a "complete physical" on plaintiff. (T. 158-59). Although at the time, plaintiff had a respiratory infection, the doctor's other findings appeared to be normal. (T. 159). On January 26, 2004, Dr. Black stated that plaintiff was tolerating his Glucotrol without problem, and that if plaintiff could keep his sugars down, the doctor would defer having plaintiff test his sugar daily. (T. 159). On February 23, 2004, Dr. Black stated that plaintiff was "doing well" except for a lot of "reflux." (T. 160). The doctor planned to prescribe Nexium for the reflux, and stated that plaintiff's current medications were Bextra, Neurontin, Glucotrol, and Viagra. (T. 160).

The last progress note from Dr. Black is dated March 12, 2004, stating that plaintiff was "in for Social Security Disability. With his diabetes and his severe injury [sic] left hand, he is totally disabled and he is trying to get Social Security Disability." (T. 160). The record also contains a form entitled "Medical Source Statement of Ability to do Work Related Activities (Physical)," completed by Dr. Black on March 16, 2004. (T. 190-93). This form indicates that plaintiff could lift and carry less than ten pounds and could stand and walk less than two hours in an eight hour work day. (T. 190). Dr. Black also checked the box on the form, stating that plaintiff could sit less than six hours in an eight hour work day and would have to alternate between sitting and standing. (T. 191). Dr. Black also stated that plaintiff was limited in his ability to push and pull with both his upper and his lower extremities. (T. 191).

The next question on the form asks what medical or clinical findings supported the doctor's opinions regarding plaintiff's abilities, and the answer to this question consists of one typewritten line, stating that the basis for all the above limitations was "[c]onsequential back injury due to altered gait." (T. 191). Dr. Black also checked boxes indicating that plaintiff could never climb, balance, kneel, crouch, crawl, or stoop, but then did not answer the question regarding what medical or clinical findings supported these conclusions. (T. 191).

Dr. Black then indicated on the form that plaintiff would be limited to occasionally reaching, handling, fingering, and feeling, but then did not explain the medical or clinical findings that supported this conclusion. (T. 192). Finally, Dr. Black noted that plaintiff had no environmental limitations, including temperature. (T. 193).

On February 19, 2003, plaintiff was consultatively examined by Dr. Myra Shayevitz, of Internal Medicine Associates, P.C. (T. 148-51). Dr. Shayevitz's report was written prior to plaintiff's [200]4 hand surgery and before plaintiff's referral to Dr. Cannizzaro for his shoulder pain. In her report, Dr. Shayevitz reviewed plaintiff's medical history, including his hand injury, diabetes, left shoulder, and left knee pain. (T. 148). Dr. Shayevitz noted that plaintiff's diabetes had been diagnosed "a year ago," and that his knee pain had been intermittent since a 1995 surgery. Dr. Shayevitz stated that plaintiff had pain on forward elevation and abduction of the left shoulder. (T. 148). She noted that he had a twelfth grade, "special education." (T. 149).

6

Dr. Shayevitz found that plaintiff's right hand and shoulder were completely normal, however, plaintiff could not "really use the left hand at all," and the left shoulder was tender. (T. 150). Plaintiff had 70 degrees of forward flexion in the spine; and external rotation and lateral flexion of the spine were at 10 degrees. Plaintiff had full rotary movements of the spine and no spinal or paraspinal tenderness. *Id*. There was no spasm, but straight leg raising on the left side caused pain at 30 degrees. There was full range of motion in the hips, knees, and ankles bilaterally. (T. 150).

Dr. Shayevitz's diagnoses were status-post significant injury to the left hand, forearm, and wrist; left shoulder injury; non-insulin dependent diabetes; and status post old left knee injury with some residual symptoms and findings. (T. 151) (emphasis added). Dr. Shayevitz stated that plaintiff's prognosis was "guarded" and that there might be some problem with very prolonged hours of sitting, standing, walking, and stair climbing, but that plaintiff's chief problem was that he could not use his left arm or hand. (T. 151).

On May 10, 2004, plaintiff was examined by Dr. T. Gerald Reap, Ph. D. (T. l82-83). Dr. Reap, a Vocational Rehabilitation Counselor, administered two psychological tests to the plaintiff: the Wide Range Achievement Test R-3 and the Slosson Intelligence Test-Revised. Dr. Reap stated that the results of plaintiff's Wide Range Achievement Test showed that he had severe learning problems that limited his ability to read and spell. (T. 182). The results of the Achievement Test also showed that plaintiff could perform only the most basic arithmetic operations. *Id*. The Intelligence Test results showed that plaintiff was a "slow learner" who would have difficulty with any formal training and would learn best by "hands-on" demonstration. Id. Dr. Reap concluded that based on plaintiff's reading and spelling subtests, he would be considered "functionally illiterate." *Id*.

Plaintiff underwent another orthopedic consultative examination after the ALJ hearing. That examination was performed on June 10, 2004 by Dr. Kalyani Ganesh, of Industrial Medicine Associates, P.C., and her report was incorporated into the record. (T. 208-11). On June 14, 2004, Dr. Ganesh completed a Residual Functional Capacity Evaluation. (T. 212-15). Dr. Ganesh's examination showed that plaintiff's gait was normal, and he could walk on his heels and toes without difficulty. (T. 209). Plaintiff's right hand and finger dexterity were intact; he could not bend the left index finger and could only partially bend the left index finger. (T. 209). Dr. Ganesh stated that plaintiff was able to use buttons, a zipper, and Velcro "primarily" with the right hand, and that he had difficulty tying a bow, "but he did manage." *Id*. Plaintiff was not able to oppose the left thumb to the index finger. *Id*.

Plaintiff's cervical, thoracic, and lumbar spine areas were normal. (T. 209-10). He had full flexion, extension, lateral flexion, and rotary movements bilaterally of all three areas. *Id*. There was no pain, spasm, tenderness, or trigger points in any of these areas. *Id*. Straight leg raising test was negative bilaterally. (T. 210). Plaintiff had a full range of motion of the forearms, elbows, right wrist, and no sensory abnormalities, or muscle atrophy in the upper extremities. (T. 210).

Plaintiff had a full range of motion in his hips, knees, and ankles. (T. 210). Strength was 5/5 in the proximal and distal muscles of his lower extremities bilaterally. There was no muscle atrophy and no sensory abnormality in plaintiff's lower extremities, and his reflexes were "physiologic and intact." (T. 210). Dr. Ganesh concluded that plaintiff would

7

have no gross limitation to sitting, standing, walking, climbing, bending, or the use of his right hand. (T. 210). Dr. Ganesh stated that plaintiff had a "moderate to severe degree of limitation" in the use of his left hand. *Id*.

In her RFC evaluation, Dr. Ganesh found that plaintiff could frequently lift and carry 20 pounds, but had no limitations in standing, walking or sitting. (T. 212-13). Plaintiff was "limited" in his ability to push or pull with his left hand. (T. 213). Although plaintiff's balancing, kneeling, crouching, crawling, and stooping would not be affected, Dr. Ganesh believed that climbing would pose a high risk due to the limited use of plaintiff's left hand. (T. 213). The only manipulative limitation cited was a limitation on "fingering," and Dr. Ganesh indicated on the form that plaintiff could finger "frequently." (T. 214).

Report–Recommendation. pp. 6-20 (footnotes omitted).

### III.   ADMINISTRATIVE LAW JUDGE'S DECISION

To be eligible for Disability Insurance benefits, a claimant must establish an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment . . . which has lasted or can be expected to last for a continuous period of not less than 12 months". 42 U.S.C. § 423(d)(1)(A). There is a five-step analysis for evaluating disability claims:

> "In essence, if the Commissioner determines (1) that the claimant is not working, (2) that he has a 'severe impairment,' (3) that the impairment is not one [listed in Appendix 1 of the regulations] that conclusively requires a determination of disability, and (4) that the claimant is not capable of continuing in his prior type of work, the Commissioner must find him disabled if (5) there is not another type of work the claimant can do." The claimant bears the burden of proof on the first four steps, while the SSA bears the burden on the last step.

*Green-Younger v. Barnhart*, 335 F.3d 99, 106 (2d Cir. 2003) (quoting *Draegert v. Barnhart*, 311 F.3d 468, 472 (2d Cir. 2002) (citing *Shaw v. Chater*, 221 F.3d 126, 132 (2d Cir. 2000) (internal citations omitted)).

In this case, the ALJ found at step one, that plaintiff has not engaged in substantial gainful activity since the alleged onset of disability. At the second step, the ALJ determined that plaintiff's "residuals of left arm, hand, and wrist trauma; left shoulder disorder; and residuals of

8

left knee trauma are considered 'severe'" but "[d]iabetes is non-severe." At the third step, the ALJ concluded that plaintiff's impairments neither met nor equaled any impairment listed in Appendix 1 of the Regulations. At the fourth step, the ALJ found that plaintiff had the following residual functional capacity:

> lift or carry 10 pounds frequently and 20 pounds occasionally using the dominant (right) hand, and no weight bearing or fine manipulation with the non-dominant (left) hand; no tasks involving bimanual dexterity; limited use of the non-dominant (left) hand and lower extremities for pushing/pulling; occasional balancing, bending, stooping, kneeling, crouching, and crawling; no climbing or crawling; avoid concentrated exposure to hazardous work conditions, such as dangerous machinery and unprotected heights, with further accommodation for moderate limitation in the ability to concentrate, maintain attention for extended periods, and keep up a pace, due to pain, and drowsiness and other side-effects related to taking pain medication.

(T. 24). The ALJ therefore found that plaintiff was unable to perform any of his past relevant work but had the residual functional capacity to perform a significant range of light work. Since plaintiff's exertional and non-exertional limitations precluded him from performing the full range of light work, the ALJ obtained the testimony of a vocational expert to determine whether there were jobs plaintiff could perform. Based on the vocational expert's testimony, the ALJ concluded at step five, that were a significant number of unskilled, light jobs in the national economy that plaintiff could perform, such as usher or lobby attendant. The Appeals Council denied plaintiff's request for review, making the ALJ's decision the final decision of the Commissioner. This action followed.

## IV. REPORT-RECOMMENDATION

In the Report-Recommendation, Magistrate Judge DiBianco found that: (1) the evidence plaintiff submitted in connection with his motion to remand did not meet the standard of "new and material evidence" because it does not relate to the time period at issue; (2) the ALJ's

9

decision to reject Dr. Black's residual functional capacity evaluation, even though he was a treating physician, was supported by substantial evidence because it was inconsistent with other evidence in the record as well as plaintiff's own testimony; (3) the ALJ properly analyzed the vocational expert's testimony and had substantial evidence on which to conclude, based on the vocational expert's testimony, that there exist a "significant number" of jobs plaintiff can perform; (4) the ALJ's finding that plaintiff's pain was not as limiting as he alleged was supported by substantial evidence; and (5) the Medical Vocational Guidelines on which plaintiff relies are inapplicable and do not, in any event, require a finding of disability based on the evidence in this case.  Accordingly, Magistrate Judge DiBianco recommended that the Court grant the Commissioner's motion for judgment on the pleadings, affirm the Commissioner's finding that plaintiff is not disabled, and dismiss the complaint.

Pursuant to 28 U.S.C. § 636(b)(1)(c), this Court engages in a *de novo* review of any part of a Report-Recommendation to which a party specifically objects.  Failure to object to any portion of a Report and Recommendation operates as a waiver of further judicial review of those matters.  *See Roldan v. Racette*, 984 F.2d 85, 89 (2d Cir. 1993); *Small v. Secretary of Health & Human Serv.*, 892 F.2d 15, 16 (2d Cir. 1989).

In this case, plaintiff submitted a letter objecting to the Report-Recommendation.  In it, plaintiff takes issue with Magistrate Judge DiBianco's conclusion that there is substantial evidence to support the ALJ's finding that plaintiff can perform the jobs identified by the vocational expert.  Plaintiff also objects to so much of the Report-Recommendation as recommends a finding that there is substantial evidence in the record from which to find that the jobs the vocational expert testified that plaintiff could perform exist in significant numbers in the

national economy. Plaintiff further contends there is no basis to controvert Dr. Black's opinion regarding plaintiff's ability to sit, stand, and walk. Finally, plaintiff argues that even assuming he could perform sedentary work, which he asserts, he cannot, he would "'grid-out' under Medical Vocational Rule 201.17". Since plaintiff has not objected to Magistrate Judge DiBianco's conclusions regarding new evidence or the credibility of his complaints of pain, the Court adopts the Report-Recommendation on those issues without further review.

## V.     DISCUSSION

A Commissioner's determination that a claimant is not disabled will be set aside when the factual findings are not supported by "substantial evidence" or when a decision is based on legal error. 42 U.S.C. § 405(g); *Shaw*, 221 F.3d at 131. Substantial evidence has been interpreted to mean "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Id*. As noted, the Court also reviews the Commissioner's decision to determine whether the Commissioner applied the correct legal standard. *See Tejada v. Apfel*, 167 F.3d 770, 773 (2d Cir. 1999).

### A.     Vocational Expert

In this case, the ALJ concluded that plaintiff had the residual functional capacity to perform a significant range of light work[1] but that plaintiff's additional exertional and non-

---

[1]The regulations define light work as follows:

> Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls. To be considered capable of performing a full or wide range of light work, you must have the ability to do substantially all of these activities. If someone can do light work, we determine that he or she can also do sedentary work, unless there are additional limiting factors such as loss of fine dexterity or inability

exertional limitations impeded his ability to perform the requirements of light work. The ALJ therefore enlisted the services of a vocational expert to determine whether there were jobs plaintiff could perform despite these limitations.

When a claimant's ability to perform a full range of a particular category of work is limited, the ALJ may use the services of a vocational expert. 20 C.F.R. §§ 404.1566(e), 416.966(e). The Commissioner may rely on the testimony of a vocational expert to sustain her burden at step five of showing the existence of substantial gainful employment suited to a claimant's physical and vocational abilities as long as "there is substantial record evidence to support the assumption upon which the vocational expert based his opinion." *Dumas v. Schweiker*, 712 F.2d 1545, 1554 (2d Cir. 1983). Indeed, "[t]he vocational expert's testimony is only useful if it addresses whether the particular claimant, with his limitations and capabilities, can realistically perform a particular job." *Abeuf v. Schweiker*, 649 F.2d 107, 114 (2d Cir. 1981).

During the hearing, the ALJ posed a series of hypothetical questions to the vocational expert in order to ascertain whether there were any jobs plaintiff could perform despite his limitations. Two of those questions are relevant to the instant discussion. In the first hypothetical question, the ALJ asked the vocational expert whether a person of plaintiff's age, residual functional capacity, and who had "a high school diploma, but . . . for our purposes . . . has a limited education" could perform a job "consistent with those limitations?" The vocational expert responded that such a person could perform ten percent of the light, unskilled jobs, such as usher or lobby attendant, that exist in the economy.

---

to sit for long periods of time.

20 C.F.R. § 404.1567(b).

The second hypothetical question the ALJ posed to the vocational expert was whether, given plaintiff's testimony at the hearing, there would be any work plaintiff could perform. The vocational expert replied that "there would not be any work, and I would base that on his testimony regarding the limited use of his non-dominant hand[2] and his somewhat limited ability to read and write."

The ALJ based his finding that plaintiff can perform light work, and in particular, a job as an usher or a lobby attendant, on the vocational expert's response to the first hypothetical question. Plaintiff argues that the first hypothetical did not adequately account for his educational limitations. Thus, plaintiff asserts, the ALJ should have relied instead on the second hypothetical question which assumed plaintiff had a limited ability to read and write. The crux of plaintiff's argument is therefore that the record lacks substantial evidence to support the vocational expert's assumption, as part of the first hypothetical question, that plaintiff had a "limited education."

The relevant regulations state that "[l]imited education means ability in reasoning, arithmetic, and language skills, but not enough to allow a person with these educational qualifications to do most of the more complex job duties needed in semi-skilled or skilled jobs. We generally consider that a 7th grade through the 11th grade level of formal education is a limited education." 20 C.F.R. § 404.1564 (b)(3).

Regarding plaintiff's ability to read and write, the evidence in the record indicates that plaintiff was able to perform his previous job in the warehouse - although the people he worked for knew that he was not "a great reader" but "more of a bull worker". The record further shows that plaintiff could "read a little bit of the sports page" as well as street signs, pay his bills, handle

---

[2] It is undisputed that plaintiff has limited use of his left, non-dominant hand.

13

a savings account, use a checkbook, and follow oral and written instructions. Further, plaintiff stated that his hobbies and interests include reading. Plaintiff testified at the hearing, however, that he "had to take an oral test" in order to get his driver's license. Plaintiff further stated that he is able to read "very little" and that he had a learning disability. Plaintiff testified that he is unable to write a note or a letter and that he has trouble spelling.

Gerard Reap, Ph.D. administered the Wide Range Achievement Test R-3 and the Slosson Intelligence Test-Revised and concluded that plaintiff could read at the second grade level, spell at the first grade level, and that his arithmetic skills were at the fifth grade level. Reap stated that "[b]ased on the reading and spelling subtests, I would classify Mr. Dixie as functionally illiterate." T. 227.

As the magistrate judge found, plaintiff's own statements, *i.e.*, that his hobbies and interest include reading and that he could follow oral and written instructions, indicate that his reading ability is not perhaps as limited as he claimed at the hearing. Further, if his statements regarding his ability to read instructions and use a check book are credited, there is some basis for concluding that plaintiff can read and write. The problem, however, is that even crediting the strongest evidence regarding plaintiff's ability to read and write, that record falls short of providing substantial evidence that plaintiff had a "limited education", specifically, that he can read, write, and do arithmetic at a 7th grade level or above. *See* 20 C.F.R. § 404.1564 (b)(3). Moreover, the ALJ did not address Dr. Reap's test results and conclusion that plaintiff is "functionally illiterate" in his decision.

Since the record lacks substantial evidence to support the portion of the first hypothetical question which required the vocational expert to assume plaintiff had a "limited education", the

14

ALJ was not entitled to rely on the vocational expert's response that plaintiff could perform light work as an usher or a lobby attendant in concluding plaintiff was not disabled.

Plaintiff argues that in view of his limited ability to read and write, and the vocational expert's testimony in response to the second hypothetical question that there are no jobs that a person with the physical and educational limitations plaintiff testified to at the hearing, could perform, the Court should award disability insurance benefits. Although plaintiff's ability to read and write is limited, the record does not contain substantial evidence which would allow a conclusion regarding the *extent* of those limitations. Additionally, there is substantial evidence that plaintiff's testimony was not entirely credible.[3] It is well-settled in this Circuit that in light of the "'essentially non-adversarial nature of a benefits proceeding,'" ALJs have an affirmative duty to develop the record. *Pratts v. Chater*, 94 F.3d 34, 37 (2d Cir. 1996) (quoting *Echevarria v. Secretary of Health and Human Services*, 685 F.2d 751, 755 (2d Cir. 1982)); *see also Shaw*, 221 F.3d at 131. "This duty exists even when the claimant is represented". *Perez v. Chater*, 77 F.3d 41, 47 (2d Cir. 1996). Thus, remand for development of the record regarding the *level* of plaintiff's reading and writing ability is required.[4]

---

[3] Indeed, plaintiff has not objected to the magistrate judge's conclusions regarding his credibility.

[4] The ALJ's decision further complicates this matter because it contains a finding that plaintiff has a high school education pursuant to § 404.1564, which explains, "[h]igh school education and above means abilities in reasoning, arithmetic, and language skills acquired through formal schooling at a 12th grade level or above." 20 C.F.R. § 404.1564(b)(4). While plaintiff indeed completed high school, a finding that he has a high school education only follows if there is no contradictory evidence. *Id*. ("the numerical grade level that you completed in school may not represent your actual educational abilities. These may be higher or lower. However, if there is no other evidence to contradict it, we will use your numerical grade level to determine your educational abilities."); *see also Skinner v. Secretary of Health & Human Services*, 902 F.2d 447, 450 (6th Cir. 1990) ("[a] numerical grade level is properly used to determine a claimant's educational abilities only if contradictory evidence does not exist."). The record in this case, as discussed above, is rife with evidence that plaintiff's ability to read and write falls below the

### B. Significant Numbers

Having concluded above that the record lacks substantial evidence to support the assumption on which the vocational expert rendered his opinion that plaintiff could perform the jobs of lobby attendant or usher, the Court need not address plaintiff's argument that the ALJ failed to show that these jobs exist in numbers significant enough to satisfy the Commissioner's burden at step five.

### C. Dr. Black – Treating Physician

Plaintiff argues that the ALJ erred because he did not give Dr. Black's opinion the controlling weight to which it, as an opinion of a treating physician, is entitled.  Specifically, plaintiff asserts that the ALJ should have given Dr. Black's opinion that plaintiff can stand and walk less than two hours in an eight-hour day, and sit for six hours in an eight-hour day, controlling weight.  Had the ALJ done so, plaintiff argues, the ALJ would have been required to conclude that plaintiff could not perform the exertional requirements of light work and find him disabled.

Under the regulations, a treating physician's opinion is entitled to "controlling weight" when it is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with substantial evidence in [the] case record." 20 C.F.R. § 404.1527(d)(2) (2001); *see also Rosa v. Callahan*, 168 F.3d 72, 78-79 (2d Cir. 1999); *Schisler v. Sullivan*, 3 F.3d 563, 567 (2d Cir. 1993).  Moreover, the applicable regulations require the Social Security Administration "to explain the weight it gives to the opinions of a treating physician." *Snell v. Apfel*, 177 F.3d 128, 133 (2d Cir. 1999) (citing 20 C.F.R. § 404.1527(d)(2) ("We will

---

high school level.

always give good reasons in our notice of determination or decision for the weight we give your treating source's opinion.")).  "The opinion of a treating physician is given controlling weight if it is well supported by medical findings and not inconsistent with other substantial evidence." *Rosa*, 168 F.3d at 78-79.

In this case, the ALJ declined to accord controlling weight to Dr. Black's March 2004 physical functional capacity evaluation, which recommended restricting standing and walking to less than two hours per day and sitting to less than six hours per day.  The ALJ discounted Dr. Black's opinion in this regard because he found it to be inconsistent with other medical evidence in the record.  The Court finds no basis to disturb the ALJ's decision.

In response to the request on the form for the "medical/clinical" finding(s)" which "support your conclusions" regarding whether standing, walking and sitting are "affected by the impairment", Dr. Black states "[c]onsequential back injury due to altered gait."  Dr. Black, however, never mentioned a back injury due to altered gait in any progress note.  Moreover, Drs. Shayevitz and Ganesh found plaintiff's gait to be normal, and that he could walk on his heels and toes without difficulty.  Further, in June 2004, Dr. Ganesh, following a consultative examination, noted that she found plaintiff had "Full R[ange] O[f] M[otion] of the hips, knees, and ankles bilaterally.  Strength 5/5 in proximal and distal muscles bilaterally.  No muscle atrophy." Additionally, although Dr. Shayevitz thought "there may be some problem with very prolonged hours of sitting, standing, walking, and stair climbing", Dr. Shayevitz does not quantify these limitations and there is no basis to conclude that these limitations are as extensive as Dr. Black indicates.  Finally, Dr. Ganesh found that plaintiff had "[n]o gross limitation to sitting, standing, walking, climbing, bending, or the use of the right upper extremity."  Thus, the Court concurs

with the magistrate judge that the ALJ's decision to reject Dr. Black's opinion regarding plaintiff's ability to walk, stand, and sit is supported by substantial evidence.

### D. Medical Vocational Guidelines - Sedentary Work

Plaintiff argues that assuming he can perform sedentary work[5] a finding of disabled is required under the Medical Vocational guidelines because his prior work history reflects 25 years of unskilled work, and he is illiterate. Medical Vocational guideline 201.17, which applies to claimants who are between the ages of forty-five and forty-nine and capable of performing only sedentary work, provides that a finding of disabled is required if the claimant is illiterate.

As discussed, there is substantial evidence in the record that supports a finding that plaintiff has the exertional capacity to perform light work, thus, Medical Vocational guideline 201.17, regarding *sedentary work,* is inapplicable. Moreover, the substantial evidence in the record does not provide a basis for a conclusion regarding the level of plaintiff's ability to read and write. Accordingly, plaintiff's objection is without merit.

### VI. CONCLUSION

For the foregoing reasons, it is hereby

---

[5]Sedentary work is defined as:

> lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools. Although a sedentary job is defined as one which involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties. Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met.

20 C.F.R. § 416.967(a).

**ORDERED** that the Report-Recommendation is rejected to the extent it recommends a conclusion that the assumption upon which the vocational expert based his opinion, specifically, that plaintiff has a "limited education" is supported by substantial evidence; and it is further

**ORDERED** that the Court renders no decision regarding whether the jobs of lobby attendant and usher exist in significant numbers; and it is further

**ORDERED** that the Court otherwise adopts the Report-Recommendation in its entirety; and it is further

**ORDERED** that this case is remanded to the Commissioner for further proceedings consistent with this opinion.

**IT IS SO ORDERED.**

**Dated:    June 12, 2008**
            **Syracuse, New York**

_____
Norman A. Mordue
Chief United States District Court Judge